**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-00160-NYW-STV

MITCHELL ARMATA,
DAVID KLEIN, and
HARVEY SENDER, in his capacity as Chapter 7 bankruptcy Trustee of Cool Frootz, LLC,

      Plaintiffs,

v.

CERTAIN UNDERWRITERS AT LLOYD'S LONDON – SYNDICATE 1861, and
ANV GLOBAL SERVICES, INC.,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendants Certain Underwriters at Lloyd's London – Syndicate 1861 ("Lloyd's") and ANV Global Services, Inc. ("ANV," and together with Lloyd's, "Defendants") Motion for Summary Judgment (the "Motion"). [Doc. 51, filed September 29, 2022]. The Court finds that oral argument would not materially assist in the resolution of the Motion. Having reviewed the Motion and corresponding briefing, the entire case file, and the applicable case law, the Motion for Summary Judgment is **DENIED**.

### BACKGROUND[1]

This is an insurance coverage dispute arising from a claim for coverage by Plaintiffs Mitchell Armata ("Mr. Armata") and David Klein ("Mr. Klein") under an insurance policy, Policy No. ANV126072A (the "Policy"), which was issued by Defendant ANV to non-party Cool Frootz

---

[1] Where the Court draws facts from the Second Amended Complaint, [Doc. 39], it provides them here solely as background, not as undisputed factual assertions, unless Defendants' admissions are also noted either through citation to their Answer to the Second Amended Complaint [Doc. 48] or to the instant Motion and record.

LLC ("Cool Frootz"), a Delaware limited liability company.  [Doc. 48 at ¶¶ 3–4, 8–9].  The Policy Period set forth in the Declarations is October 30, 2018 to October 30, 2019.  [Doc. 51 at ¶ 9 (citing [Doc. 39-1 at 16; Doc. 48-1 at 16]); Doc. 58 at 3, ¶ 9].  Plaintiff Harvey Sender ("Mr. Sender" and, collectively with Messrs. Armata and Klein, "Plaintiffs") is the appointed bankruptcy trustee of Cool Frootz.  [Doc. 39 at ¶ 3; Doc. 48 at ¶ 3].

On September 20, 2018, Cool Frootz filed a Chapter 11 Voluntary Petition for bankruptcy in the United States Bankruptcy Court for the District of Colorado, claiming liabilities of $1,000,001 to $10,000,000.  [Doc. 39 at ¶ 15].  Thereafter, Mr. Sender was appointed as trustee pursuant to 11 U.S.C. § 704, "to administer all assets of the bankruptcy estate, including litigation claims."  [*Id.* at ¶¶ 3, 17; Doc. 48 at ¶ 3].  Counsel for Messrs. Armata and Klein sent an email to Mr. Sender on May 2, 2019 ("May 2, 2019 Email"), indicating that they represented "minority equity members" in Cool Frootz who "intend to assert claims against certain other officers/members."  [Doc. 48-2 at 2].  Mr. Sender investigated these claims in May 2019.  [Doc. 39 at ¶ 20].

By letter dated December 27, 2019, Mr. Sender provided notice to Defendants of Messrs. Armata's and Klein's claims against "Cool Frootz's directors and officers, Richard Naja and Bruce Beutler[,]" for "corporate waste and self-dealing" ("Trustee Notice").  [*Id.* at ¶ 22; Doc. 51 at ¶ 22; Doc. 48-6 at 4–5].  Around the same time, Messrs. Armata and Klein also provided notice to Defendants of their claims for losses caused by the Directors for "certain acts, omissions, misstatements, and negligence involving . . . the viability of the Company, the capitalization table, the corporate structure, and corporate governance" (the "Shareholder Notice").  [Doc. 51 at ¶ 18; Doc. 48-5 at 2–3].  Plaintiffs allege that, although they "complied with their obligations under the Policy," Defendants failed do the same and, instead, "first responded to the Trustee Notice four

months later and flatly denied coverage under the Policy by denying their duty to defend and duty to indemnify." [Doc. 39 at ¶¶ 24–25]. Plaintiffs also alleged that Defendants "failed, refused to, or inadequately investigate[d] the claims asserted in the notices" and, if they had conducted an investigation, such "investigation was not a proper or reasonable" one. [*Id.* at ¶¶ 26–27]. Plaintiffs further claimed that Defendants "failed or refused to respond to the Shareholder Notice." [*Id.* at ¶ 28].

Plaintiffs initiated this action on September 18, 2020, by filing a Complaint and Jury Demand against Defendant ANV in the District Court, City and County of Denver, State of Colorado. *See* [Doc. 6]. On December 29, 2020, the Colorado state court granted Plaintiffs' request to dismiss Defendant ANV and substitute AmTrust at Lloyd's Syndicate 1861 ("AmTrust") as the named defendant. *See* [Doc. 9 at 2–3]. On January 19, 2021, AmTrust removed the action to the United States District Court for the District of Colorado, based on diversity jurisdiction. *See* [Doc. 1]. On March 8, 2022, Plaintiffs filed the operative Second Amended Complaint, wherein they named Defendants Lloyd's and ANV as the proper party defendants. *See* [Doc. 39]; *see also* [Doc. 36 at ¶¶ 1–4]. In the operative Second Amended Complaint, Plaintiffs asserted four claims: (1) breach of contract, against Lloyd's ("Count I"); (2) breach of contract, against ANV ("Count II"); (3) breach of the implied covenant of good faith and fair dealing, against Lloyd's ("Count III"); and (4) breach of the implied covenant of good faith and fair dealing, against ANV ("Count IV"). [Doc. 39 at ¶¶ 30–51]. On March 22, 2022, Defendants filed a Partial Motion to Dismiss, seeking to dismiss Plaintiffs' bad faith claims under Counts III and IV pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* [Doc. 41]. On August 10, 2022, the Court granted the Partial Motion to Dismiss, leaving only Counts I and II, alleging breach of contract against Lloyd's and ANV, respectively. *See* [Doc. 47]. On August 24, 2022,

Defendants filed their Answer to the Second Amended Complaint, [Doc. 48 at 1–13], along with a Second Amended Counterclaim for Declaratory Judgment, seeking a declaration "that no coverage is available for the May 2, 2019 Email" or based on any of the other notice letters that Plaintiffs submitted to Defendants regarding their claims against the officers of Cool Frootz, [*id.* at 13–25].

On September 29, 2022, Defendants filed the instant Motion for Summary Judgment, seeking summary judgment in their favor on Plaintiffs' remaining breach of contract claims and Defendants' Second Amended Counterclaim "seeking a declaration that coverage is not available for claims made by" Cool Frootz or the Trustee under the Policy.  [Doc. 51 at 1].[2]  Plaintiffs responded on October 31, 2022, [Doc. 58], and Defendants replied on November 14, 2022, [Doc. 60].  The Motion for Summary Judgment is thus ripe for disposition.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial.  *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  At all times, the Court will "view the factual record and draw all reasonable

---

[2] Defendants make no distinction between their arguments seeking summary judgment in their favor with respect to the Second Amended Counterclaim and summary judgment against Plaintiffs as to their breach of contract claims.  *See generally* [Doc. 51].

4

inferences therefrom most favorably to the nonmovant." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016) (quotations omitted).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of a party's case or the denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). For instance, "if th[e] evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## ANALYSIS

In support of their Motion for Summary Judgment, Defendants argue that for coverage to be triggered under the Policy, "a **Claim** for a **Wrongful Act** . . . during the **Policy Period**,"[3] had

---

[3] When referring to specific terms used in the subject Policy, this Order will utilize the same bolded

to be made against the insured, i.e., Cool Frootz, but no such **Claim** was made, and thus, the Policy was not triggered.  [Doc. 51 at 2].  Plaintiffs disagree, arguing that the May 2, 2019 Email falls under the Policy's definition of a **Claim**.  *See* [Doc. 58].[4]

## I.    Undisputed Material Facts

1.    The subject Policy, no. ANV126072A, was issued by ANV to Cool Frootz, on behalf of AmTrust, for the period October 30, 2018 to October 30, 2019.  [Doc. 51-1 at 7–47]. The relevant provisions in the Policy are as follows:

> **Section I.  Insuring Agreements**
>
> **A.**  The **Insurer** shall pay on behalf of an **Insured Person** all **Loss** for which such **Insured Person** is not indemnified by the **Company** and which the **Insured Person** is legally obligated to pay as a result of a **Claim** for a **Wrongful Act** first made against the **Insured Person** during the **Policy Period**, or the applicable Discovery Period pursuant to Section VIII, and reported to the **Insurer** in compliance with Section VII.
>
> * * *
>
> **Section II.  Definitions**
>
> **C.**  **"Claim"** shall mean
>
> > 1) a written demand for monetary or other legal relief made against any **Insured** (including any request to toll or waive any statute of limitations); . . .

---

terms as used in the Policy.

[4] Defendants argue, in the alternative, that "even if the May 2, 2019 Email was considered a notice of circumstances that may give rise to a **Claim** under Policy Section VII.B., . . . coverage is still unavailable here because a copy of the May 2, 2019 Email was never reported to Defendants during the **Policy Period**."  [Doc. 51 at 2–3]; *see also* [*id.* at 19 ("[E]ven though the May 2, 2019 Email does not constitute a **Claim**, to the extent the email could have constituted notice of circumstances that may give rise to a **Claim** and had been reported to the **Insurer** during the **Policy Period**, coverage may have been available for the subsequently reported Demand Letter, Trustee Notice, and September 18, 2020 Notice.")].  However, Plaintiffs explicitly state in the Response that they "are not seeking in the alternative a claim based on a notice of an occurrence under Section VII.B of the Policy."  [Doc. 58 at 2].  Thus, the Court will not address this argument.

A **Claim** shall be deemed "made" at the time it is received by an **Insured**.

. . .

**R.** "**Insured**" shall mean any **Insured Person** and the **Company**.

**S.** "**Insured Person**" shall mean:

1) **Directors** and **Officers**; . . .

3) any managing member or manager of any **Company** organized as a limited liability company;

. . .

**Y.** "**Policy Period**" shall mean the policy period as set forth in the Declarations, or its earlier termination if applicable.

**GG**. "**Wrongful Act**" shall mean:

1) any actual or alleged act, omission, error, misstatement, misleading statement, neglect, or breach of duty, by any **Insured Person** in their capacity as such with the **Company**, including, if coverage is purchased as stated in the Declarations, any **Employment Practices Wrongful Act** or **Third Party Discrimination**;

\* \* \*

**Section VII. Notice of Claim**

**A.** The **Insured** shall, as a condition precedent to their rights under this Policy, give the **Insurer** notice in writing of any **Claim** which is made during the **Policy Period** or Discovery Period.  Such notice shall be given as soon as practicable upon knowledge of the chief executive officer, chief financial officer, general counsel, director of human resources, risk manager, or equivalent position of any of the foregoing, but in no event later than 1) sixty (60) days after the end of the **Policy Period** or 2) the expiration date of the Discovery Period, if applicable.  If notice is provided pursuant to this Section, any **Claim** subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the prior noticed **Claim** or alleging any **Related Wrongful Acts**, shall be considered related to the prior **Claim** and made at the time notice of the prior **Claim** was first provided.

[*Id.* at 13–15, 19–20, 22, 31].[5]

---

[5] The "Discovery Period" under this section relates to Section VIII of the Policy, *see* [Doc. 51-1 at 32], which states:

2.      On May 2, 2019, counsel for Messrs. Armata and Klein sent an email to counsel for the Chapter 7 Bankruptcy Trustee of Cool Frootz, Mr. Sender (or "Trustee"), stating as follows:

> I'm reaching out to you in connection with the above case.  Diana Fitzgerald and myself represent minority equity members in the debtor that intend to assert claims against certain other officers/members.  We'd like to discuss with you possible points of cooperation we may have with the trustee in pursuing our claims.  Please let me know your availability to talk[.]

[*Id.* at 73 ("May 2, 2019 Email")].

3.      On May 28, 2019, counsel for Messrs. Armata and Klein had a telephone conference with the Trustee's counsel "to discuss claims against certain officers/members Richard Naja and Bruce Beutler of Cool Frootz, and the nature of their wrongdoing including acts, omissions, misstatements, and negligence involving, among other things, viability of Cool Frootz, and deficiencies in the capitalization table, corporate structure, and corporate governance."  [Doc. 58-1 at 2, ¶ 5].  The Trustee's counsel "also discussed claims the Debtor had against Naja and Beutler for their wrongful acts including corporate waste and fair dealing that ultimately caused the Debtor to file for bankruptcy."  [*Id.*]; *see also* [Doc. 60-1 at ¶ 11].[6]

---

> In the event the **Insurer** or the **Company** refuses to renew this Policy, the **Company** shall have the right, upon payment of one hundred percent (100%) of the annual premium, (or if the **Policy Period** is other than annual, one hundred percent (100%) of the annualized premium), to an extension of the coverage provided by this Policy with respect to any **Claim** first made against any **Insured** during the period of twelve (12) months after the end of the **Policy Period** and reported to the **Insurer** pursuant to the provisions of this Policy, but only with respect to any **Wrongful Act** committed or alleged to have been committed before the end of the **Policy Period**.  This twelve (12) month period shall be referred to in this Policy as the Discovery Period.

[*Id.*].  The Parties agree that the "Discovery Period" under Section VIII does not apply to Plaintiffs here because Cool Frootz did not renew the Policy or purchase Discovery Period coverage when the Policy was not renewed.  [Doc. 51 at ¶¶ 10–11; Doc. 58 at 3, ¶¶ 10–11].

[6] Defendants "dispute and object" to this paragraph on the grounds that (1) the statements "imply that a discussion regarding 'claims' satisfies the Policy's definition of a **Claim**, which it does not"; (2) the terms "claims" and "Debtor" are not defined, "and therefore they are ambiguous within the context of Paragraph 11"; (3) "the statements in Paragraph 11 [are] hearsay"; and (4) "to the extent

4.      On December 27, 2019, counsel for Messrs. Armata and Klein sent a demand letter

("Notice of Demand") to counsel for the Trustee, stating:

> This letter serves as demand for reimbursement of losses that my clients have sustained. I direct this demand to the Company and your client, Harvey Sender, who is the duly appointed and acting trustee in the Company's Bankruptcy Case. Specifically, the Shareholder Group has direct claims against the Company's directors and officers, Richard Naja and Bruce Beutler for their Wrongful Acts, and/or against the Company. Such Wrongful Acts include, but are not limited to certain acts, omissions, misstatements, and negligence involving, among other things, the viability of the Company, the capitalization table, the corporate structure, and corporate governance.

[Doc. 51-1 at 54 (footnote omitted)].

---

Plaintiffs characterize the May 2, 2019 [E]mail as the 'claim,'" Defendants dispute Plaintiffs' characterization because the email does not constitute a **Claim** under the Policy." [Doc. 60-1 at ¶ 11]. However, none of Defendants' objections challenge the *facts* here—i.e., that the call happened or the substance of what was discussed during that call—and Defendants fail to cite any evidence that genuinely disputes the assertions in that paragraph. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").

The Court also disagrees with Defendants' assertion that the terms "the claims" and "Debtor" are "ambiguous within the context of Paragraph 11." [Doc. 60-1 at ¶ 11]. Indeed, Paragraph 11 of the Response—which mirrors Paragraph 5 of the Declaration of Diana L. Fitzgerald, [Doc. 58-1]—characterizes (1) the "claims against certain officers/members Richard Naja and Bruce Beutler of Cool Frootz" as "acts, omissions, misstatements, and negligence involving, among other things, viability of Cool Frootz, and deficiencies in the capitalization table, corporate structure, and corporate governance"; and (2) "claims the Debtor had against Naja and Beutler for their wrongful acts including corporate waste and fair dealing that ultimately caused the Debtor to file for bankruptcy." [Doc. 58-1 at ¶ 5]. Moreover, it is obvious that the "Debtor" is Cool Frootz. Indeed, Cool Frootz is the only "Debtor" that the Parties have acknowledged in this case. *See, e.g.*, [Doc. 48 at ¶ 3 (Defendants' answer to the Second Amended Complaint, wherein they "admit the allegations" that Plaintiff Sender "is the duly appointed bankruptcy trustee of Cool Frootz, LLC ('Cool Frootz' or '*Debtor*'), a Delaware limited liability company authorized to conduct business in the state of Colorado." (emphasis added))]. Further, Defendants' challenge on hearsay grounds is also without merit. Notably, Defendants fail to explain how Ms. Fitzgerald's recounting a first-hand event constitutes inadmissible hearsay. *See Bryant*, 432 F.3d at 1122 ("[I]f th[e] evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge.").

5.      The same day, counsel for Messrs. Armata and Klein provided written notice to ANV of their claim (i.e., the Shareholder Notice, or "Notice of Claim"), stating in relevant part:

> While the Shareholder Group has sent a notice of demand to the Company (via the trustee in the bankruptcy matter), this letter serves as the Shareholder Group's written notice of a claim (the "Claim") under the Policy for their sustained losses. Be advised that the Shareholder Group has direct claims involving the Company's directors and officers, Richard Naja and Bruce Beutler, for their Wrongful Acts.

[*Id.* at 49; Doc. 51 at ¶ 19; Doc. 58 at 4, ¶ 19].

6.      In addition, counsel for the Trustee notified ANV that the Trustee was joining the Notice of Claim submitted by Messrs. Armata and Klein ("Trustee Notice"), and also adding his own claims of corporate waste and self-dealing against Messrs. Naja and Beutler, as follows:

> The Trustee has been apprised of certain claims of minority shareholders, Mitchell Armata and David Klein (the "Shareholder Group") against Cool Frootz's directors and officers, Richard Naja and Bruce Beutler ("Insured Persons").  The Trustee asserts that the allegations raised by the Shareholder Group against Cool Frootz's officers and directors may also be pursued by Cool Frootz's bankruptcy estate pursuant to 11 U.S.C. § 541.  By this letter, the Trustee joins in the Notice of Claim submitted by the Shareholder Group, and supplements its claims against the Insured Persons to include corporate waste and self-dealing.

[Doc. 51-1 at 51]; *see also* [*id.* at 56–59].

7.      On April 16, 2020, ANV issued a letter to the Trustee's counsel denying coverage for the Demand Letter on the basis that "the **Claim** was made outside of the applicable **Policy Period**."  [*Id.* at 61–65; Doc. 51 at ¶ 24; Doc. 58 at ¶ 24].

## II.   Discussion

The issue presented here is whether the May 2, 2019 Email constitutes a **Claim** under the Policy.  *See* [Doc. 51 at 10–19; Doc. 58 at 11–18; Doc. 60 at 3–10].  As reflected above, there are two requirements applicable to Plaintiffs to trigger coverage under the Policy: (1) a **Claim**

regarding Cool Frootz must have been "made during the **Policy Period**"[7]; and (2) Cool Frootz was required to provide ANV written notice of that **Claim** no later than "sixty (60) days after the end of the **Policy Period**." [Doc. 51-1 at 31]; *see also* [Doc. 51 at 11].[8]  The **Policy Period** was from October 30, 2018 to October 30, 2019. [Doc. 51-1 at 7].  Thus, the May 2, 2019 Email is the only document that the Parties identify as a possible **Claim** that was "made during the **Policy Period**" that would give rise to coverage under the Policy. *See, e.g.*, [Doc. 51 at 12 (Defendants' assertion that "[t]he only document that could even be considered a **Claim** made during the **Policy Period** is the May 2, 2019 Email"); Doc. 58 at 2 (Plaintiffs' argument that "the May 2, 2019 email constitutes a claim under the plain language of the Policy, and applicable law.")].

### A.    Choice of Law

As an initial matter, the Policy contains a choice of law clause, which states that "[a]ll matters arising hereunder including questions related to the validity [sic] interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York notwithstanding New York's conflicts of law rules." [Doc. 51-1 at 35].  Here, the Parties agree that New York law applies to Plaintiffs' breach of contract claims pursuant to the choice of law clause under the policy.  *See* [Doc. 51 at 10; Doc. 58 at 10]. Accordingly, the Court will apply New York law.[9]  *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will

---

[7] Under the Policy, "[a] **claim** shall be deemed 'made' at the time it is received by an **Insured**." [Doc. 51-1 at 15].

[8] Moreover, there is no dispute that, on December 27, 2019, counsel for the Trustee provided the Trustee Notice to ANV, notifying it about the Notice of Claim submitted by Messrs. Armata and Klein, as well as the Trustee's claims of corporate waste and self-dealing against Mr. Naja and Mr. Beutler.  *See* [Doc. 51-1 at 51–52, 56–59].

[9] As a result, the Court does not address the Parties' arguments relying upon, or citations to, Colorado law in their briefs.

proceed under the same assumption."); *Precision Fitness Equip. of Pompano Beach, Inc. v. Nautilus, Inc.*, No. 08-CV-01228-CMA-KLM, 2010 WL 551404, at *3 (D. Colo. Feb. 11, 2010) (citing *One Nat'l Bank v. Antonellis*, 80 F.3d 606, 608 (1st Cir. 1996)) (observing "where the parties agree as to which substantive law controls in a diversity case, the Court can, and ordinarily should, accept such a concession").

### B.    New York Law Regarding Insurance Policies

New York courts recognize that "[a]n insurance agreement is subject to principles of contract interpretation." *Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017) (quotations omitted).  Thus, "[a]n insurance contract must be read as a whole to determine what the parties reasonably intended by its terms." *Alfin, Inc. v. Pac. Ins. Co.*, 735 F. Supp. 115, 119 (S.D.N.Y. 1990).  A court will "not disregard clear provisions which the insurers inserted in the policies and the insured accepted, and equitable considerations will not allow an extension of coverage beyond its fair intent and meaning in order to obviate objections which might have been foreseen and guarded against." *Raymond Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 833 N.E.2d 232, 234 (N.Y. 2005) (citation omitted).  "[E]xclusions or exceptions from coverage must be specific and clear in order to be enforced." *Hudson Shore Assocs., L.P. v. Praetorian Ins. Co.*, 172 A.D.3d 830, 830–831 (2019) (citation omitted).  But, before courts turn to the rules governing the construction of ambiguous contracts, they "must first find ambiguity in the policy." *Breed v. Ins. Co. of N.A.*, 385 N.E.2d 1280, 1282 (N.Y. 1978).

Generally, "courts bear the responsibility of determining the rights or obligations of parties under insurance contracts based on the specific language of the policies." *New York v. Home Indem. Co.*, 486 N.E.2d 827, 829 (1985); *see also Jakobson Shipyard, Inc. v. Aetna Cas. and Sur. Co.*, 961 F.2d 387, 389 (2d Cir. 1992) ("We give the words of the agreement their ordinary and plain meaning.").  In doing so, they must "construe the policy in a way that affords a fair meaning

to all of the language employed by the parties in the contract and leaves no provision without force and effect." *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 991 N.E.2d 666, 671–72 (N.Y. 2013) (quotations omitted). "If, however, the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact." *Home Indem. Co.*, 486 N.E.2d at 829. Conversely, "if the tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court." *Id.*; *see also Demetrio v. Stewart Title Ins. Co.*, 124 A.D.3d 824, 826 (2015). "Under those circumstances, the ambiguity must be resolved against the insurer which drafted the contract." *Id.* (quotations omitted); *see also Primavera v. Rose & Kiernan, Inc.*, 248 A.D.2d 842, 843 (1998) ("[I]t is well settled that resolution of the rights and liabilities of parties to an insurance contract is a question of law for a court to determine based upon the specific provisions of the policy at issue, unless the terms of the policy are ambiguous and require consideration of extrinsic evidence as an aid to construction.").

### C.    The Policy Language is Not Ambiguous.

The Policy defines a **Claim** as "a written demand for monetary or other legal relief made against any **Insured** (including any request to toll or waive any statute of limitations)." [Doc. 51-1 at 14].[10] The Parties do not argue that the Policy is ambiguous with respect to this term, *see* [Doc. 51; Doc. 58; Doc. 60], and the Court also concludes that this term is not ambiguous.

---

[10] The Policy also defines **Claim** in other ways that are not relevant to this case. *Compare* [*id.* at 14–15 (the definitions)] *with* [Doc. 51 at 11 (Defendants identifying the only "relevant part" of the definition as "a written demand for monetary or other legal relief made against any **Insured**")] *and* [Doc. 58 at 12 (Plaintiffs' assertion that "[a]ll that is required is 'a written demand for monetary or other legal relief made against an **Insured**'")].

However, the term "demand," as used in the definition of **Claim**, is not separately defined in the Policy. *See generally* [Doc. 51-1 at 14–22]. "[E]ven where a contract does not define a particular—and potentially ambiguous—term, a body of state law or an established custom fills in the gaps left by the drafters." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001). Under New York law, courts should interpret the language in insurance policies "in accordance with its understanding by the average person . . . who, of course, relates it to the factual context in which it is used." *Michaels v. Buffalo*, 651 N.E.2d 1272, 1273 (N.Y. 1995) (cleaned up).

Plaintiffs direct the Court's attention to Merriam-Webster's Online Dictionary to support that "demand" means "to ask or call for with authority; claim as due or just" or "something claimed as due or owed." [Doc. 58 at 13]; *see also Demand*, https://www.merriam-webster.com/dictionary/demand (last visited May 23, 2023); *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) ("Not surprisingly, a favored source of the average person's understanding of a term is the dictionary."); *Jakobson Shipyard*, 961 F.2d at 389 (assigning a term in an insurance policy the meaning accorded by Webster's Third New International Dictionary). Defendants, for their part, rely upon *Weaver v. Axis Surplus Insurance Co.*, 639 F. App'x 764, 766 (2d Cir. 2016), wherein the Second Circuit explained that "a demand requires an imperative solicitation for that which is legally owed, as distinguished from a request carrying no legal consequences." *See* [Doc. 60 at 9–10; Doc. 51 at 13]. The Court finds that these definitions are not inconsistent with one another.

Accordingly, for purposes of the instant Motion, the Court will utilize the definition of "demand" identified by Defendants in *Weaver*, as it (1) sufficiently captures the definition

proffered by Plaintiffs as to what a claim *is*,[11] and (2) clarifies what a claim is *not*—that is, "a request carrying no legal consequences." *Weaver*, 639 F. App'x at 766; *see also Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000) ("The fact . . . that terms of a policy of insurance may be construed as ambiguous where applied to one set of facts does not make them ambiguous as to other facts which come directly within the purview of such terms." (quoting 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 21:14 (1997))).

### D.     The May 2, 2019 Email Constitutes a Claim under the Policy.

The Court now turns to the primary issue of whether the May 2, 2019 Email constitutes a **Claim** under the Policy.  The Policy defines a **Claim** as "a written *demand* for monetary or other legal relief made against any **Insured**."  [Doc. 51-1 at 14 (emphasis added)].  And, as discussed above, a "demand" in this context means an "imperative solicitation for that which is legally owed, as distinguished from a request carrying no legal consequences." *Weaver*, 639 F. App'x at 766 (quotations omitted).  Because the Parties do not raise authenticity issues with respect to the May 2, 2019 Email, nor suggest that the term **Claim** as used in the Policy is ambiguous such that extrinsic evidence will aid in ascertaining the intended meaning of that term, s*ee generally* [Doc. 51; Doc. 58; Doc. 60], the question before the Court "is one of law for the court to determine." *City of New York v. Evanston Ins. Co.*, 39 A.D.3d 153, 156 (2007); *see also Armstrong v. United Frontier Mut. Ins. Co.*, 181 A.D.3d 1332, 1334 (2020) ("Here, defendant failed to submit sufficient extrinsic evidence to demonstrate that the term 'acceptable' required plaintiff to submit a sworn proof of loss.  We thus resolve the ambiguity against defendant and conclude that the policy did

---

[11] *Compare Weaver*, 639 F. App'x at 766 ("[A] demand requires an imperative solicitation for that which is legally owed, as distinguished from a request carrying no legal consequences." (internal quotation marks omitted)) *with* [Doc. 58 at 13 ("to ask or call for with authority; claim as due or just" or "something claimed as due or owed")].

not require plaintiff to submit a sworn proof of loss.").  More specifically, this Court considers whether the May 2, 2019 Email constitutes a *written* "imperative solicitation" for monetary or other legal relief against Cool Frootz, as opposed to merely "a request carrying no legal consequences."  *Weaver*, 639 F. App'x at 766.

Defendants contend that the May 2, 2019 Email is not a "demand" but instead "is simply 'a request carrying no legal consequences,' which is not a **Claim** under New York law."  [Doc. 51 at 16 (citing *Weaver*, 639 F. App'x at 766)]; *see also* [Doc. 60 at 10 (arguing that the May 2, 2019 Email "is not an imperative solicitation for that which is legally owed but instead was a request by Plaintiffs to set up a call with the Bankruptcy Trustee")].  The Court respectfully disagrees.  Notably, Defendants make this conclusory assertion without actually discussing the distinction "between a demand and a mere request which carries no legal consequences."  *Gil Enters., Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996).  "To make such a distinction," however, "it is necessary to look to the purpose of a demand."  *Id.*

As the Second Circuit explained in *Gil Enterprises*, "the gravamen of a legal demand is its *notice providing function*."  *Id.* at 246 (emphasis added).  That is because, "[b]y its nature, a demand is intended to trigger certain rights and obligations" and "[i]n order to prompt such rights and obligations, it is necessary that the party upon whom the demand is being made be put on notice that those legal obligations have been triggered."  *Id.*[12]  Thus, to resolve the primary question of whether the May 2, 2019 Email constitutes a *written* "imperative solicitation for that which is legally owed, as distinguished from a request carrying no legal consequences," *Weaver*,

---

[12] The *Weaver* court relied expressly on *Gil Enterprises* in asserting the principle Defendants urge this Court to adopt in this case: "[U]nder New York law, 'a demand requires an imperative solicitation for that which is legally owed,' as distinguished from a request carrying no legal consequences."  *Weaver*, 639 F. App'x at 766 (quoting *Gil Enterprises*, 79 F.3d at 246); *see also* [Doc. 51 at 13, 16; Doc. 60 at 4, 9 (Defendants' reliance upon *Weaver*)].

639 F. App'x at 766, the Court must answer the secondary question of whether the email put Cool Frootz on notice of Messrs. Armata's and Klein's "inten[tion] to trigger certain rights and obligations" under the Policy. *Gil Enters.*, 79 F.3d at 246. The Court finds that it does.

The subject line of the May 2, 2019 Email is "Cool Frootz," and the email asserts that (1) Messrs. Armata and Klein are "pursuing" and "intend to assert claims against certain . . . officers/members" of Cool Frootz; and (2) their counsel was seeking to "discuss . . . possible points of cooperation . . . with the [T]rustee in pursuing [the] claims," and requested the Trustee's counsel's "availability to talk" about the subject matter of the email. [Doc. 51-1 at 73]. The Court finds that the substance of the May 2, 2019 Email serves a notice-providing function, by reflecting an "inten[tion] to trigger certain rights and obligations" of Cool Frootz, *see Gil Enters.*, 79 F.3d at 246, with respect to Messrs. Armata's and Klein's "claims against certain . . . officers/members" of the company. As a result, the email reflects that Messrs. Armata and Klein, through their counsel, were soliciting—or, at the very least, intending to solicit—some form of monetary or other legal relief from Cool Frootz.

The Court therefore finds that the May 2, 2019 Email constitutes a **Claim** under the Policy and New York law, as opposed to a mere "request carrying no legal consequences." *Weaver*, 639 F. App'x at 766; *see also* [Doc. 58 at 14 ("The Claim Email contains the term 'claim' in two places. And in the context of the email, the language of the Claim Email advises the Bankruptcy Trustee that Armata and Klein intend to pursue and assert claims against certain officers/members. Armata and Klein also inquired as to the Bankruptcy Trustee's cooperation in pursuing those claims. As

such, the language in the Claim Email constitutes a warning of liability.")]. Accordingly, denial of Defendants' Motion for Summary Judgment is appropriate here.[13]

Nevertheless, the Court considers Defendants' remaining arguments below—particularly those related to (1) the requisite level of specificity to make a **Claim** under the Policy; and (2) Defendants' reliance upon *Evanston Insurance Company v. GAB Business Services, Inc.*, 132 A.D.2d 180 (1987), to support their position. *See* [Doc. 51 at 13–16]. As discussed below, these arguments do not warrant a finding in favor of Defendants.

### 1.   Level of Specificity Required to Make a Claim under the ANV Policy

The Parties appear to dispute the requisite level of specificity required to establish a **Claim** under the Policy and/or New York law. For instance, Defendants contend that the May 2, 2019 Email does not constitute a **Claim** under the Policy because it contains "no demand for any relief (monetary or non-monetary), no recitation or explanation of any damages, and no explanation of what the 'certain claims' are against certain unnamed 'other officers/members.'" [Doc. 51 at 15]. Plaintiffs counter that, apart from a general demand for relief, "nothing in the definition of claim under the Policy requires" the level of specificity that Defendants argue in their opening brief. [Doc. 58 at 12]. The Court respectfully agrees.

The ANV Policy's definition of **Claim** does not require a written "recitation . . . of any damages" or "explanation of what the 'certain claims' are against certain unnamed 'other officers/members,'" as Defendants suggest. [Doc. 51 at 15]. The only requirement to state a

---

[13] Defendants suggest that the email's use of the term "claims" is irrelevant because "[n]othing in the **Claim** definition provides that, so long as the word 'claim' is used in written communication, it constitutes a **Claim** under the Policy." [Doc. 60 at 2]. However, this Court does not interpret Plaintiffs' argument to be that the use of the term "claim" necessarily meets the definition of **Claim** under the Policy. Indeed, there seems to be no dispute that the Policy's definition of **Claim** is silent on this issue. *See* [*id.* ("Nothing in the **Claim** definition provides that, so long as the word 'claim' is used in written communication, it constitutes a **Claim** under the Policy.")].

**Claim** under the Policy is to make "a written demand for monetary or other legal relief . . . against any **Insured**." [Doc. 51-1 at 14].

Defendants also cite *Purcigliotti v. Risk Enterprise Management Limited*, 240 A.D.2d 205, 206 (1997), for the proposition that "[a] 'claim,' as defined in the subject policy, is not merely an awareness of the possibility that some wrongdoing has occurred, but rather a demand for *specific* relief that can be defended, settled and paid by the insurer." [Doc. 51 at 13 (emphasis added)]. Plaintiffs challenge the application of *Purcigliotti* because, *inter alia*, "the definition of the term 'claim' in the Policy does not include the language that it must be 'a demand for specific relief that can be defended, settled and paid by the insurer.'" [Doc. 58 at 16]. Defendants, in turn, reply that "Plaintiffs ignore the fact that *Purcigliotti* was reiterating how courts applying New York law interpret a claim within the context of insurance policies and how that interpretation informs the construction of key terms used within the Policy's **Claim** definition." [Doc. 60 at 10].

However, the Court finds Defendants' reliance on *Purcigliotti* to be misplaced. Notably, in stating that a "claim" requires "a demand for *specific* relief," 240 A.D.2d at 206 (emphasis added), the *Purcigliotti* court relied exclusively upon *Evanston Insurance Company v. GAB Business Services, Inc.*, 132 A.D.2d 180 (1987)—the case which, as discussed further below, Defendants argue is the most analogous to this action and warrants summary judgment in their favor. *See Purcigliotti*, 240 A.D.2d at 206 (citing *Evanston*, 132 A.D.2d at 185); *see also* [Doc. 51 at 15 ("Like in [*Evanston Insurance Co. v.*] *GAB Business Services*, . . . the May 2, 2019 Email does not constitute a **Claim** as defined in the Policy.")]. However, the *Evanston* court did not use the term "specific" when describing the type of demand required to state a "claim" under an insurance policy. Instead, the court stated broadly that "a claim . . . must be a type of demand that can be defended, settled and paid by the insurer." *Evanston*, 132 A.D.2d at 185.

Moreover, Plaintiffs compare the Policy's definition of **Claim** with Section VII.B. of the Policy—which is not at issue in this case[14]—to support their position "[t]hat the specificity Defendants demand is not required pursuant to the Policy" language.  [Doc. 58 at 12].  The Court finds this comparison persuasive.  Section VII.B. provides an alternative for providing notice of a claim as follows:

> If during the **Policy Period** the **Company** or any **Insured** becomes aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, *with full particulars as to dates, persons and entities involved*, then a **Claim** which is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Related Wrongful Acts**, shall be considered made at the time notice of such circumstances was given.

[Doc. 51-1 at 31–32 (italics added)].  Relying upon this language, Plaintiffs contend that, unlike Section VII.B.—which requires "full particulars as to dates, persons and entities involved" to file a notice of claim under that section—Section VII.A. (i.e., the Notice of Claim section at issue in this case) does not mandate such specificity "for making a claim against an insured or for reporting such a claim to the Insurer."  [Doc. 58 at 12].

In their Reply, Defendants argue that "Plaintiffs[] attempt to create an ambiguity by referencing language in Section VII.B," [Doc. 60 at 5], reasoning that "language used in a separate provision that does not define a **Claim**" constitutes "an attempt by Plaintiffs to circumvent the Policy's **Claim** definition in a self-serving manner."  [*Id.* at 2].  But the Court does not construe Plaintiffs' reference to Section VII.B. as an attempt to avoid the Policy's definition of a **Claim** or to create an ambiguity, as Defendants suggest.  To be sure, "[a]mbiguity in a contract arises when the contract, *read as a whole*, fails to disclose its purpose and the parties' intent, or when specific

---

[14] *See supra* note 3.

language is susceptible of two reasonable interpretations." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (emphasis added) (citations and internal quotations omitted). However, language in a contract "is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms." *Moore v. Kopel*, 237 A.D.2d 124, 125 (1997).

Here, as noted above, the Parties do not argue that the term **Claim** under the Policy is ambiguous. In addition, unlike Section VII.B. of the Policy—which requires "full particulars as to dates, persons and entities involved" when providing written notice to the insurer under that section—Section VII.A. of the Policy does not contain these same express requirements. Thus, Plaintiffs' reference to the language under Section VII.B. underscores how *Defendants'* argument—that a **Claim** requires a "recitation . . . of . . . damages" or "explanation of what the 'certain claims' are against certain unnamed 'other officers/members,'" [Doc. 51 at 15]—is based on a narrower definition of that term than what is actually stated in the sections of the Policy *at issue in this case*.[15]  *See Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 300 (2d Cir. 1996) ("[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity.").

Moreover, even if such an ambiguity existed regarding the requisite level of specificity required to state a **Claim** as defined in the Policy, or under New York law, this Court is "guided by New York's well-established *contra proferentem* rule, pursuant to which unresolvable

---

[15] *Compare, e.g.*, [Doc. 51-1 at 14 (The Policy, defining a **Claim** as "a written demand for monetary or other legal relief made against any **Insured**")] *with* [Doc. 51 at 15 (Defendants arguing that "the May 2, 2019 Email does not constitute a **Claim** *as defined in the Policy*" because there is "no recitation or explanation of any damages, and no explanation of what the 'certain claims' are against certain unnamed 'other officers/members'" (italics added))] *and* [Doc. 51-1 at 31–32 (Section VII.B. of the Policy, stating that the insured shall provide a notice of circumstances to the insurer regarding "the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, *with full particulars as to dates, persons and entities involved*" (italics added))].

ambiguities in insurance contracts are construed in favor of the insured." *Hugo Boss Fashions, Inc.*, 252 F.3d at 615; *see also Primavera*, 248 A.D.2d at 843 ("In order for the insurer to prevail, it must demonstrate not only that its interpretation is reasonable but that it is the only fair interpretation.").

> 2. ***Evanston Insurance Company v. GAB Business Services, Inc.*, 132 A.D.2d 180 (1987)**

Defendants also rely heavily upon *Evanston Insurance Company v. GAB Business Services, Inc.*, to support that the May 2, 2019 Email is not a **Claim** under the Policy. *See* [Doc. 51 at 13–16]. Specifically, Defendants insist that "[l]ike in *GAB Business Services* . . . the May 2, 2019 Email does not constitute a **Claim** as defined in the Policy" because it contains "no demand for any relief (monetary or non-monetary), no recitation or explanation of any damages, and no explanation of what the 'certain claims' are against certain unnamed 'other officers/members.'" [Doc. 51 at 15]. However, these arguments miss the mark.

As an initial matter, the Court has already addressed that the Policy's definition of **Claim** does not require a written "recitation . . . of any damages" or "explanation of what the 'certain claims' are against certain unnamed 'other officers/members,'" as Defendants suggest. *See supra* Section III.D.1. Moreover, and in any event, Defendants' reliance on *Evanston* is misplaced. As discussed below, the Court agrees that *Evanston* is instructive here, but respectfully disagrees that it supports Defendants' position.

*Evanston* involved a plaintiff-insurer, Evanston Insurance Company ("Evanston"), that contracted to defend the insured, GAB Business Services, Inc. ("GAB"), against any "claims made" against it during the policy period October 15, 1979 to October 15, 1980. *Evanston*, 132 A.D.2d at 181. GAB—itself an insurance adjusting company—had entered a three-year contract with the Southern California Rapid Transit District ("RTD") whereby GAB would provide various

administrative services. *Id.* The issue before the *Evanston* court was "whether [a] 30-day notice letter which RTD sent to GAB on December 22, 1978"—i.e., before the Evanston policy period— "constituted a 'claim', defined in Evanston's policy as 'a demand received by the insured [GAB] for money or services, including the service of suit or institution of arbitration proceedings against the Insured.'" *Id.* at 185.[16]

The 30-day notice letter demanded "a broad spectrum of performance deficiencies be corrected," and also "demanded that specified steps be taken to correct the deficiencies within 30 days, and warned that if that were not accomplished, RTD would consider exercising its option to cancel the contract." *Id.* at 182. The letter did not, however, "assert that GAB had caused financial or other damages to RTD, it did not assert or refer to the existence of a claim for damages, and it did not include a reservation of rights to claim damages." *Id.*[17] The court rejected Evanston's argument that the 30-day notice letter could be construed as a "claim," reasoning that it contained "no mention of damages or compensation" but, instead, "merely contained statements of dissatisfaction with certain aspects of GAB's past performance, a demand for future performance *in accordance with the [GAB-RTD] contract*, and a warning that failure to correct the deficiencies

---

[16] This definition is similar to the definition of **Claim** under the ANV Policy here. *Compare* [Doc. 51-1 at 14 (defining **Claim** to include "a written demand for monetary or other legal relief made against any **Insured**") *with Evanston*, 132 A.D.2d at 181 ("The policy defined a claim as 'a demand received by the Insured [GAB] for money or services, including the service of suit or institution of arbitration proceedings against the Insured.'").

[17] Evanston commenced an action against GAB, American Home Assurance Company (GAB's pre-Evanston insurer), and RTD "seeking, in its first cause of action, a declaratory judgment that [it was] not obligated to defend or indemnify GAB" on various claims later asserted by RTD. *Evanston*, 132 A.D.2d at 184. In the trial court, Evanston argued that the claims asserted by RTD "were first made against GAB prior to the inception date of Evanston's policy." *Id.* GAB countered that Evanston's first cause of action should be dismissed "on the ground that, as a matter of law, the December 22, 1978 [30-day notice] letter to GAB was not a claim under the Evanston policy, and that RTD's first claim against GAB was made no earlier than December 1979 during the Evanston policy period." *Id.*

listed might result in cancellation of the contract for cause *as defined in the [GAB-RTD] contract*."
*Id.* at 185 (emphasis added).

Significantly, the *Evanston* court made two observations that Defendants overlook in relying on that case. The first is that RTD sent the 30-day notice letter to GAB pursuant to a cancellation clause in the GAB-RTD services contract, under which the complaining party was required "to issue a 30-day notice to the other party to cure performance problems" and "[i]f those problems were not corrected within 30 days, a 60-day notice of termination could be issued." *Id.* at 182. Indeed, the *Evanston* court explained that GAB "perceiv[ed] the [30-day notice] letter as simply a demand for improved future service *in order to comply with its contract*," and therefore it "did not notify American Home [its pre-*Evanston* insurer] that a claim had been made against it by RTD." *Id.* at 182 (emphasis added). Instead, GAB "formulated a plan to correct the deficiencies, and outlined the plan" in a letter to RTD dated January 11, 1979 (i.e., 20 days after RTD sent the 30-day notice letter), "which plan RTD later approved." *Id.* Here, Defendants fail to explain how—for purposes of determining whether a writing is a **Claim** under the ANV Policy—the contractually mandated 30-day notice to cure in *Evanston* compares to the May 2, 2019 Email, wherein Messrs. Armata and Klein expressed their "inten[tion] to assert claims against certain . . . officers/members" of Cool Frootz. [Doc. 51-1 at 73].

Second, the *Evanston* court emphasized that the policy "must be read as a whole to determine what the parties must have reasonably intended by its terms." *Evanston*, 132 A.D.2d at 185 (quotations omitted). As to the subject policy in that case, the court observed that

> [t]he definition of a "claim" in the Evanston policy appears in a section entitled "The Coverage", which also sets forth that Evanston is obligated to pay "all sums *** which the Insured shall become legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD." Another provision in "The Coverage" section obligates Evanston to "defend any claim or suit against the Insured seeking damages to which this

insurance applies" and that Evanston "shall not be obligated to pay any claim or judgment or to defend or continue to defend any suit or claim" after the applicable liability limit has been exhausted.

*Id.*  Thus, in light of the above, the court concluded that "[r]eading the contract as a whole, the parties *intended that a claim must relate to an assertion of legally cognizable damage*, and must be *a type of demand that can be defended, settled and paid by the insurer.*  That is the essence of the agreement." *Id.* (emphasis added).

Here, similar to the Evanston policy's "The Coverage" section, the "Insuring Agreements" section of the ANV Policy states that ANV is obligated to pay "all **Loss** . . . which the **Insured Person** is legally obligated to pay as a result of a **Claim** for a **Wrongful Act** first made against the **Insured Person** during the **Policy Period** . . . and reported to the **Insurer** in compliance with" the Policy.  [Doc. 51-1 at 13].[18]  Another provision, under the "Costs of Defense and Settlements" section, states that ANV "will have no obligation to pay **Loss**, including **Costs of Defense**, or to defend or continue to defend any **Claim** under any Insuring Agreement or endorsement" after the applicable policy limit has been exhausted.  [*Id.* at 31].

Thus, reading the ANV Policy as a whole—and given the parallels between the definitions of a **Claim** and the other policy provisions in the ANV Policy and the *Evanston* policy—the Court similarly finds here that the parties to the ANV Policy "intended that a claim must relate to an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer." *Evanston*, 132 A.D.2d at 185.[19]  Accordingly, under *Evanston*, the relevant issue for the Court is whether the May 2, 2019 Email "*relate[s] to* an assertion of legally

---

[18] **Loss** is defined under the Policy to include "compensatory damages, statutory attorneys' fees, pre- and post-judgment interest, **Derivative Demand Investigation Costs** and **Costs of Defense**, in excess of the Retention."  [Doc. 51-1 at 20].

[19] Notably, Defendants quote this portion of the *Evanston* court's holding in their opening brief, but fail to explain how it applies to this case.  *See* [Doc. 51 at 13–14].

cognizable damage" and is "a type of demand that can be defended, settled and paid by" ANV. *Id.* (emphasis added).  For the reasons discussed below, the Court finds that it does.

***Assertion of Legally Cognizable Damage.***  First, the May 2, 2019 Email *relates to* an assertion of legally cognizable damage.  The email states that Messrs. Armata and Klein "intend[ed] to assert claims against certain . . . officers/members" of Cool Frootz, and their counsel requested counsel for the Trustee's "availability" to "discuss . . . possible points of cooperation we may have with the [T]rustee in pursuing [the] claims." [Doc. 51-1 at 73].  Notably, Plaintiffs claim that the May 2, 2019 Email was followed by a phone call later that month between counsel for Messrs. Armata and Klein and counsel for the Trustee, as follows:

> On May 28, 2019, Jonathan Feldman and [Diana Fitzgerald], counsel for Plaintiffs Armata and Klein, had a telephone conference with the Bankruptcy Trustee's counsel, Jonathan Dickey, to discuss claims against certain officers/members Richard Naja and Bruce Beutler of Cool Frootz, and the nature of their wrongdoing *including acts, omissions, misstatements, and negligence involving, among other things, viability of Cool Frootz, and deficiencies in the capitalization table, corporate structure, and corporate governance*.  Bankruptcy Trustee's counsel also discussed claims the Debtor had against Naja and Beutler for their wrongful acts including corporate waste and fair dealing that ultimately caused the Debtor to file for bankruptcy.

[Doc. 58-1 at ¶ 5 (emphasis added); Doc. 58 at 8–9, ¶ 11].  Defendants do not dispute that this phone call took place, nor do they dispute the substance of the call.  *See* [Doc. 60-1 at ¶ 11].  Thus, the Court finds that the May 2, 2019 Email "relate[d] to an assertion of legally cognizable damage," *Evanston*, 132 A.D.2d at 185—namely, damages related to "claims against certain officers/members Richard Naja and Bruce Beutler of Cool Frootz" for "acts, omissions, misstatements, and negligence involving, among other things, viability of Cool Frootz, and deficiencies in the capitalization table, corporate structure, and corporate governance." [Doc. 58-1 at ¶ 5].

*Type of Demand that Can Be Defended, Settled, and Paid.*  Second, the May 2, 2019 Email is "a type of demand that can be defended, settled and paid by" ANV.  *Evanston*, 132 A.D.2d at 185.  As previously mentioned, the relevant insuring agreement under the Policy provides that

> [t]he **Insurer** shall pay on behalf of an **Insured Person** all **Loss** for which such **Insured Person** is not indemnified by the **Company** and which the **Insured Person** is legally obligated to pay as a result of a **Claim** for a **Wrongful Act** first made against the **Insured Person** during the **Policy Period** . . . and reported to the **Insurer** in compliance with Section VII.

[Doc. 51-1 at 13].  "**Wrongful Act**" is defined under the Policy as "any actual or alleged act, omission, error, misstatement, misleading statement, neglect, or breach of duty, by any **Insured Person** in their capacity as such with the **Company**."  [*Id.* at 22].  And the Policy defines "**Insured Person**" as including "**Directors** and **Officers**" and "any managing member or manager of any **Company** organized as a limited liability company."  [*Id.* at 19].  Defendants do not argue that Messrs. Naja and Beutler fall outside the scope of "**Insured Person[s]**" as defined under the Policy.  *See generally* [Doc. 51; Doc. 60].

Accordingly, given the references in the May 2, 2019 Email to "claims" by Messrs. Armata and Klein "against certain . . . officers/members" of Cool Frootz, the relation between the May 2, 2019 Email "to an assertion of legally cognizable damage," and the terms of the Policy, the Court finds that the May 2, 2019 Email constitutes the "type of demand that can be defended, settled and paid by" ANV.  *Evanston*, 132 A.D.2d at 185.

Moreover, unlike the 30-day notice letter in *Evanston*, the May 2, 2019 Email does not "merely contain[] statements of dissatisfaction with certain aspects of [Cool Frootz's] past performance, a demand for future performance in accordance with [a contract between Messrs. Armata and Klein and Cool Frootz]," or any "warning that failure to correct the deficiencies listed might result in cancellation of" any such contract.  *Id.* at 185.  In sum, the Court finds that *Evanston*

supports a determination that the May 2, 2019 Email constitutes a **Claim** as contemplated under the ANV Policy.[20]

Finally, a finding that the May 2, 2019 Email constitutes a **Claim** under the *Evanston* test—because it "relate[s] to an assertion of legally cognizable damage" and is "a type of demand that can be defended, settled and paid by" ANV, *Evanston*, 132 A.D.2d at 185—is also consistent with the Court's initial conclusion that, pursuant to *Weaver*, the May 2, 2019 Email constitutes "a demand [that] requires an imperative solicitation for that which is legally owed," as opposed to a mere "request carrying no legal consequences." *Weaver*, 639 F. App'x at 766.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)       Defendants' Motion for Summary Judgment [Doc. 51] is **DENIED**; and

(2)       A Telephonic Status Conference is **SET** for **June 22, 2023 at 11:00 a.m.** for purposes of setting a Final Pretrial/Trial Preparation Conference.  All participants

---

[20] Defendants also cite other cases interpreting New York law to support that "New York courts have consistently held that such general communications, like the May 2, 2019 Email, substantively do not constitute a **Claim**." [Doc. 51 at 13–14].  However, none of the cases cited by Defendants resolves the question of whether an email that references "claims" that individuals "intend to assert" against the insured, like the May 2, 2019 Email, constitutes a **Claim** as defined under the Policy.  For instance, Defendants cite *Windham Solid Waste Management District v. National Casualty Co.*, 146 F.3d 131, 134 (2d Cir. 1998), for the proposition that "a claim must be a 'specific demand for relief.'" [Doc. 51 at 13].  However, unlike the ANV Policy here, the policy in that case did not contain any "formal definition of the term 'claim[.]'" *Windham*, 146 F.3d at 134.  Defendants also cite *WMOP, LLC v. Scottsdale Insurance Co.*, 192 A.D.3d 411 (2021), *see* [Doc. 51 at 14], where the court held that a "letter from a law firm, which requested records from [the plaintiff] but made no demands for relief, cannot be deemed a 'claim' made during the . . . policy period." *WMOP*, 192 A.D.3d at 412.  However, unlike the letter at issue in *WMOP*, the May 2, 2019 Email in this case did not request any documents from Cool Frootz.  Instead, it states that Messrs. Armata and Klein "intend[ed] to assert claims against certain . . . officers/members" of Cool Frootz, and their counsel requested counsel for the Trustee's "availability" to "discuss . . . possible points of cooperation [they] may have with the [T]rustee in pursuing [the] claims." [Doc. 51-1 at 73].

shall use the following dial-in information: 888-363-4749, Access Code: 5738976

to participate at the designated time.

DATED:  May 24, 2023

BY THE COURT:

_____
Nina Y. Wang
United States District Judge